Filed 11/26/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B332945 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA093728) |
| v. | |
| FAHIM ANTHONY MULTANI, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge. Affirmed.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

Fahim Anthony Multani appeals the trial court's denial of his petition for compassionate release under Penal Code section 1172.2.[1]  The California Department of Corrections and Rehabilitation (CDCR) indicated Multani has "a serious and advanced illness with an end-of-life trajectory" within the meaning of section 1172.2, subdivision (b)(1) and recommended that his sentence be recalled.  Multani was diagnosed with stage IV lung cancer in 2014, while he was awaiting trial.  By 2017, the cancer had metastasized to his brain.  However, his cancer is caused by a specific gene mutation and has been successfully treated with targeted medication for the past seven years.  Medical notes indicated there was no evidence of disease progression or active disease.  Multani's doctor described the cancer as "perfectly suppressed."  The trial court therefore concluded Multani's illness does not currently have an end-of-life trajectory.

Multani contends the trial court's interpretation of "end-of-life trajectory" was too narrow and the term should be interpreted as encompassing any serious and advanced illness for which death would be predictable and foreseeable if intervention were withdrawn.  Multani also contends the express language of the statute covers his disease and renders him presumptively eligible for compassionate release.  We reject these arguments.  Because "end-of-life trajectory" indicates that the illness must, at the very least, be progressing toward death, we conclude the trial court did not err in finding that the facts presented failed to support the petition for Multani's release.

---

[1]     All undesignated statutory references are to the Penal Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A detailed recitation of the facts underlying Multani's convictions is unnecessary to the resolution of this appeal. In summary, in September and October 2012, Multani repeatedly punched, slapped, and kicked his then-girlfriend and cohabitant, Jennifer P. He also struck her with a belt and a plank of wood, choked her until she was almost unconscious, stabbed her with broom bristles, and used a knife to threaten her. (*People v. Multani* (Mar. 8, 2018, B270411) [nonpub. opn.].)

In 2015, a jury found Multani guilty of one count of torture (§ 206), one count of corporal injury to a fellow parent (§ 273.5, subd. (a)), and two counts of battery against a fellow parent (§ 243, subd. (e)(1)). He was sentenced to life in prison with the possibility of parole.

Prior to his conviction, in 2014, Multani was diagnosed with stage IV lung cancer. He tested positive for ALK gene rearrangement. Doctors therefore prescribed ALK mutation-treating drugs. Multani initially had an "excellent response" to the first of these drugs. However, by February 2017, it appeared the cancer had metastasized to his brain. In March 2017, his consulting physician, Dr. John R. Wilkinson, placed Multani on a new ALK mutation-treating medication, to which he responded well.[2] There was no new or recurrent tumor growth between December 2017 and April 2018, and, in November 2018, Dr. Wilkinson noted there was "no sign of disease, still has stage

---

[2]     Dr. Wilkinson later testified that the first drug Multani received "doesn't penetrate or spread well into the brain" and it was common for it to be effective elsewhere but ineffective in the brain, "which is why it is now used less often," and why Multani's current treatment is now "the preferred option."

IV cancer, however excellent response to suppressive chemotherapy." Between February 2019 and November 2021, MRI and PET CT scans continued to show no evidence of disease progression or active disease. In November 2021, Dr. Wilkinson observed that Multani's cancer "appears well controlled."

Sometime after November 2021, it appears Multani was released, but he was subsequently rearrested and returned to prison.[3] In March 2023, Multani informed Dr. Wilkinson that he was pursuing compassionate release after new changes in the law. Dr. Wilkinson indicated he would support the request, as Multani "has widespread metastatic cancer which is not curable and is on extremely expensive treatment which requires frequent imaging studies. This would be more convenient and less expensive out of the custody setting." MRI imaging of Multani's brain from March 2023 indicated that Multani's lung cancer remained stable and there was no sign of any new or enhancing lesions on his brain.

In June 2023, Dr. Joseph Bick, Director of Health Care Services for CDCR, recommended that Multani's prison commitment and sentence be recalled under section 1172.2 in light of his metastatic lung cancer. The recommendation stated that the radiation and chemotherapy treatments Multani received could not cure his cancer; Multani's illness caused weakness and problems with balance and cognition that required use of a wheelchair; and physicians, including a cancer specialist, had determined that he had a serious and advanced illness with

---

[3] The record provides few details regarding Multani's release and reincarceration. However, medical notes indicated: "Patient pursuing compassionate release a second time after being released and then reincarcerated."

4

an end-of-life trajectory.  Multani also filed a recall and resentencing brief.

In August 2023, the court held a hearing to obtain additional information about Multani's medical condition.  The court heard testimony from Dr. Wilkinson and Dr. Michele Ditomas, a doctor who supports the CDCR compassionate release process.

Dr. Wilkinson is a board-certified oncologist and hematologist.  He testified that he had been treating Multani since July 2016.  Multani's specific gene mutation was "incredibly important," because "it means that the targeted molecular treatment or special designed chemical will modify or shut down the cancer cells for the time you are taking the medication.  [¶]  It is not a curative treatment but rather a suppressive treatment and for ALK positive tumors it can in some people be extraordinarily effective."  Multani's current treatment regimen consists of a medication he takes twice a day, PET CT scans every four to six months, and MRI scans of his brain every four months.

According to Dr. Wilkinson, although individuals with widespread lung cancer that is not due to a targeted gene mutation have a prognosis of nine to 18 months, Multani had been diagnosed with stage IV cancer nine years earlier and had responded "extraordinarily well" to treatment.  His latest PET CT scan showed "no evidence of any measurable lung cancer." Dr. Wilkinson described Multani's cancer as "perfectly suppressed," and "by no means in remission," but "completely suppressed."  Dr. Wilkinson could not definitively predict how Multani would continue to respond to his current course of treatment, but he opined that "the best expectation is people tend

5

to continue doing how they've done in the past."  He observed that there were several additional courses of treatment that had been developed during the past 10 years and which may be options for Multani if the current course of treatment ceased to be effective.

When asked whether he believed Multani had less than six months to live, Dr. Wilkinson stated: "I'd have to say my professional opinion would be in terms of the lifespan of the average patient with lung cancer he's done much better than the other patients, but I can't construe that at any moment if he may feel significant progression and may not respond to future treatment.  [¶]  I would be comfortable saying his average survival would be less than 6 months with the understanding that it easily could be much longer."  However, Dr. Wilkinson stated that Multani was "responding optimally, perfectly to the current treatment which again is suppressive as opposed to curative."  Dr. Wilkinson supported compassionate release, explaining Multani "has clearly widespread uncurable lung cancer which is thankfully currently being suppressed by an expensive medication, but he is unncurable [*sic*]."

Dr. Ditomas had not met Multani, but she reviewed his medical records and spoke with people involved in his care.  She testified that Multani's medication "is currently controlling his cancer" but he is not cured and "it's hard to say exactly how long it's going to be effective."  It was her understanding that if Multani's medication stopped working "or he develops intolerable side effects," Multani would have "less than 6 to 10 months" to live.  She also observed that there were potentially lethal effects to his medication and that if he developed one of these side effects, he would be unable to continue taking the medication.

6

In his closing argument, Multani's attorney conceded that he did not believe "there is any clear answer" as to whether Multani's disease was on an end-of-life trajectory and that the trial court was in "uncharted waters." However, he argued that Multani satisfied the requirement for compassionate release because "clearly his life is much shorter than it would have been." Counsel for the People argued that the petition was premature, as Multani's cancer was suppressed and he was doing well.

The trial court noted there was no appellate guidance on the meaning of "end-of-life trajectory" under section 1172.2. It found the undisputed evidence established that Multani's illness was uncurable, but also observed: "[E]nd of life trajectory doesn't mean uncurable illness because if it's just mere uncurable illness the Legislature would have written that for us to follow." The court also suggested that an illness that merely shortens life is not what the Legislature intended. Multani's condition had not deteriorated in the past years and, although it was unclear from the record how long his illness would remain suppressed, Dr. Wilkinson's testimony indicated that Multani's long positive response to his medication meant he would continue to have a positive response. The court therefore concluded that Multani's illness was not in the stage intended by the Legislature and denied the request for compassionate release. The court indicated the decision was without prejudice to another petition "should the medication stop working tomorrow, next month, next year, in 5 years . . . ."

Multani timely appealed.

## DISCUSSION

**I.  The Trial Court Did Not Err in Concluding Multani is Not Presently Eligible for Compassionate Release Under Section 1172.2**

### A.  Section 1172.2 and applicable legal principles

Assembly Bill No. 960 (2021–2022 Reg. Sess.), which took effect January 1, 2023, added section 1172.2 to the Penal Code to reorganize and amend the procedures for compassionate release requests from CDCR.  (Stats. 2022, ch. 744, § 3.)  Under the amended law, if the statewide chief medical executive, in consultation with other clinical executives, determines that the requirements of section 1172.2, subdivision (b), are satisfied, CDCR must recommend to the court that the incarcerated person's sentence be recalled.  (§ 1172.2, subd. (a).)

Subdivision (b) creates "a presumption favoring recall and resentencing" if the court finds an incarcerated person satisfies one of two medical criteria: "(1) The incarcerated person has a serious and advanced illness with an end-of-life trajectory.  Examples include, but are not limited to, metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced end-stage dementia" (*id.*, subd. (b)(1)); or "(2) The incarcerated person is permanently medically incapacitated with a medical condition or functional impairment that renders them permanently unable to complete basic activities of daily living . . . ."  (*Id.*, subd. (b)(2).)

This presumption "may only be overcome if a court finds the defendant is an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18, based on the incarcerated person's current physical and mental condition."  (§ 1172.2, subd. (b).)  "Section 1170.18 defines unreasonable risk

8

as 'an unreasonable risk that the [defendant] will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of [s]ection 667.' [Citation.] These felonies are called super strikes and include such felonies as 'murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer . . . or any sexually violent offenses or sexual offense committed against minors under the age of 14.' [Citation.]" (*People v. Gonzalez* (2024) 103 Cal.App.5th 363, 369–370 (*Gonzalez*).)

Resolving the question presented in this appeal requires us to interpret section 1172.2. We therefore "apply the well-established rules of statutory construction and seek to ' "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citations.] As always, we begin with the words of a statute and give these words their ordinary meaning. [Citation.] If the statutory language is clear and unambiguous, then we need go no further. [Citation.] If, however, the language is susceptible to more than one reasonable interpretation, then we look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' [Citation.]" (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.) We review questions of statutory interpretation de novo. (*People v. Prunty* (2015) 62 Cal.4th 59, 71 (*Prunty*).) However, we review the trial court's factual findings with respect to section 1172.2 for substantial evidence. (*People v. Lewis* (2024) 101 Cal.App.5th 401, 409 (*Lewis*) [trial court abuses its discretion when factual findings critical to decision find no support in the evidence]; see also *People v. Torres* (2020) 48 Cal.App.5th 550,

9

555 [upholding trial court's factual findings under prior compassionate release law where supported by substantial evidence].)

As a preliminary matter, Multani contends that a recommendation from the statewide chief medical executive based on a diagnosis of one of the diseases listed in section 1172.2, subdivision (b)(1), creates a presumption favoring recall and resentencing which can only be overcome by a trial court's finding that the incarcerated person poses an unreasonable risk to public safety.  However, section 1172.2, subdivision (b), provides that the presumption in favor of recall and resentencing arises only if *the court* finds the facts described in subdivision (b)(1) or (2).  Here, the trial court found the facts insufficient to conclude the subdivision (b)(1) criteria were met.

### B.    End-of-life trajectory

Multani makes two central arguments on appeal.  First, Multani contends that section 1172.2, subdivision (b)(1), only requires "an illness that has a fatal prognosis and death is predicted and foreseeable *if intervention is withdrawn* due to the incurable disease." (Italics added.)  Second, he argues the court lacked the discretion to find that he did not satisfy the requirements of subdivision (b)(1) because the statute includes "metastatic solid-tumor cancer" as an example of a serious and advanced illness with an end-of-life trajectory, and it is undisputed that Multani has non-small cell cancer of the lung that metastasized to his brain.

Turning to Multani's first argument, it appears the parties do not dispute that "widespread metastatic incurable lung cancer" is a "serious and advanced illness," and we assume the same.  We focus our analysis on the meaning of "with an end-of-

10

life trajectory." The statute does not define "trajectory." The word is commonly understood as the figurative and transferred use of its meaning in physics: "[t]he path of any body moving under the action of given forces . . . ." (Oxford English Dict. Online (3d ed. 2024) <https://www.oed.com/dictionary/trajectory_adj?tab=meaning_and_use#17904260> [as of Nov. 26, 2024], archived at <https://perma.cc/MA55-YPJ8>; accord, Merriam-Webster's Unabridged Dict. (Online 2024) <https://unabridged.merriam-webster.com/unabridged/trajectory> [as of Nov. 26, 2024], archived at <https://perma.cc/4N2G-4ZLZ> ["a path, progression, or line of development likened to a physical trajectory"].) Using this plain meaning, the term the Legislature chose indicates that section 1172.2, subdivision (b)(1), requires that the illness is developing or moving the incarcerated person toward the end of that person's life.

Nothing in the plain language of the statute suggests the Legislature intended the subdivision (b)(1) determination to be based on what the trajectory of the illness would be if the incarcerated person received no further medical treatment. Neither subdivision (b)(1) nor any other part of section 1172.2 refers to treatment or medical intervention. If the Legislature intended the compassionate release criteria to include serious and advanced illnesses that progress to death only if left untreated, it could have explicitly so stated. It did not.

Further, to the extent the plain meaning of "end-of-life trajectory" is ambiguous, the legislative history does not persuade us that the broader interpretation Multani advances is consistent with the Legislature's intent.

11

There were several versions of Assembly Bill No. 960 before the final enactment.  As originally proposed, the bill would have amended the medical parole statute.  When shifted to amend the compassionate release provisions of the Penal Code instead, the legislation proposed several changes that would, among other things, codify specific timeframes for a decision on a recommendation for release, authorize a facility's chief medical officer to determine whether an incarcerated person satisfies the criteria for release instead of the CDCR Secretary, *require* CDCR to recommend recall of a person's sentence if that person qualifies, and create the presumption favoring recall.  (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 960 (2021–2022 Reg. Sess.) as amended Aug. 16, 2022, pp. 4–5.)  These modifications confirm that a legislative purpose of Assembly Bill No. 960 was to make compassionate release available to more incarcerated persons.

Most relevant here were the changes to the first set of criteria for eligibility for release.  An early proposal would have replaced the then-existing requirement that the incarcerated person be "terminally ill with an incurable condition caused by an illness or disease that would produce death within 12 months" with the requirement that the person have "an incurable disease or medical condition with an end-of-life trajectory."  (Sen. Amend. to Assem. Bill No. 960 (2021–2022 Reg. Sess.) as amended May 27, 2022, p. 10.)  A subsequent amendment replaced "an incurable disease or medical condition" with "*a serious and advanced illness*," and added the four specific examples.  (Sen. Amend. to Assem. Bill No. 960 (2021–2022 Reg. Sess.) as amended Aug. 16, 2022, pp. 2, 16.)  A description of this version of the bill in one Assembly Floor analysis noted that the new

12

"standard is more in alignment with federal compassionate release guidelines where '[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.' [Citation.] Instead, a defendant need only show that they are 'suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).' [Citation.]" (Assem. Conc. Sen. Amends. to Assem. Bill No. 960 (2021–2022 Reg. Sess.) as amended Aug. 16, 2022, p. 2.) And, indeed, the language and examples in section 1172.2, subdivision (b)(1), are identical to portions of the federal sentencing guidelines regarding federal compassionate release.[4] These changes, too, suggest a legislative intent to broaden the eligibility criteria for compassionate release and make it available to more incarcerated persons.

---

[4] Under federal law, a court may reduce a term of imprisonment if it finds "extraordinary and compelling reasons warrant such a reduction," after considering specified additional factors, and when the reduction is "consistent with applicable policy statements issued by the Sentencing Commission." (18 U.S.C. §§ 3582(c)(1)(A), 3553(a).) Section 1B1.13(b)(1)(A) of the United States Sentencing Commission Guidelines Manual provides that "extraordinary and compelling reasons" exist when "[t]he defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." (U.S. Sentencing Commission Guidelines Manual (Nov. 2024) p. 48 <https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2024/GLMFull.pdf> [as of Nov. 26, 2024], archived at <https://perma.cc/SVQ4-7TZW>.)

Yet, while "terminally ill," "incurable disease," and "serious and advanced illness" may all convey somewhat different meanings, the progression of proposed amendments does not suggest that the replacement of a specific time-defined prognosis with "end-of-life trajectory" was intended to extend compassionate release to those suffering from illnesses with an end-of-life trajectory only if treatment is withdrawn.

Multani relies on a Senate Committee on Public Safety analysis which included the statement of the author of the bill. The author's statement indicated the bill was necessary because prior law governing compassionate release was "too narrow and the process too cumbersome for a population that poses the lowest risk to public safety.  As a result, very few people are granted relief and, consequently, many die while awaiting a referral to the court."  (Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 960 (2021–2022 Reg. Sess.) as amended May 27, 2022, p. 5.)  This resulted in the State "spending more money to cover costly health care services for a population that is nearing death or requiring thoughtful medical attention."  (*Ibid*.; Assem. Conc. Sen. Amends. to Assem. Bill No. 960, *supra*, as amended Aug. 16, 2022, p. 3.)  Multani contends this demonstrates the bill was intended to also extend compassionate release eligibility to incarcerated persons based on the consideration that their illnesses, like Multani's, are expensive to treat.

Initially, we note that the statement Multani relies on, while presented to and presumably considered by the Legislature as a whole, reflected the view of only one legislator.  It is therefore not an indication that " 'those who supported his proposal shared his view of its compass.' [Citation.]" (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28

14

Cal.3d 692, 700; *People v. Farell* (2002) 28 Cal.4th 381, 394 [California Supreme Court has frequently observed that "the expressions of individual legislators generally are an improper basis upon which to discern the intent of the entire Legislature."].)[5]

We acknowledge, however, that saving on health care costs in prisons was a legislative purpose of the statute enacting the original compassionate release provisions in 1997, and of a 2007 amendment that extended eligibility to medically incapacitated prisoners. (*People v. Loper* (2015) 60 Cal.4th 1155, 1160 ["[m]otivated in part by the Legislature's desire to save the prison system money," former section 1170, subdivision (e), set forth procedures for Secretary of CDCR or Board of Parole Hearings to recommend sentence recall].) In *Martinez v. Board of Parole Hearings* (2010) 183 Cal.App.4th 578, the court detailed the legislative history of the 1997 law, noting the purpose of Assembly Bill No. 29 (1997–1998 Reg. Sess.), "was not just compassion; it was to save the state money." (*Martinez*, at p. 590.) Relevant legislative reports detailed the costs of incarcerating terminally ill prisoners, the effect on the CDCR budget, and the anticipated cost savings should the

---

[5]     Multani also cites portions of a legislative report that appeared to quote or paraphrase the statement of a criminal justice advocacy organization in support of the bill. As with the statements of individual legislators, we cannot presume that the entire Legislature agreed with this statement. Nor does the portion Multani cites—that " 'California's prisons were not designed to serve as hospice centers and nursing homes' "— clearly support his argument that the statute was amended to include illnesses that would only have an end-of-life trajectory if treatment is withdrawn.

15

compassionate release law go into effect.  (*Id.* at pp. 590–591.)
The court further described the legislative history of the 2007 bill
amending the law, Assembly Bill No. 1539 (2007–2008 Reg.
Sess.), referred to in at least one legislative analysis as the
" 'Medical Release and Fiscal Savings Bill,' " again explaining
that the history "reflects that the purpose of the provision is not
just compassion; it is to save the state money."  (*Id.* at p. 591.)

The legislative history of Assembly Bill No. 960 does not so
emphatically indicate that a predominant purpose of eliminating
a specific prognosis of life expectancy and aligning the eligibility
criteria with federal guidelines was to increase fiscal savings.
But even assuming cost-savings was one purpose of the bill,
nothing in the legislative history indicates that the fiscal
rationale was at any point disconnected from the concept that the
release provisions would apply to incarcerated persons who are
currently approaching death or are severely incapacitated, and
are therefore less likely to pose a safety risk to the public.  (See,
e.g., *Gonzalez, supra*, 103 Cal.App.5th at p. 370 ["Section 1172.2
thus presumes a terminally ill inmate is a low risk to be released
from custody because of their diagnosis, even if not fully
rehabilitated."].)

Multani contends the end-of-life-trajectory qualification, in
replacing the former "less-than-a-year-to-live standard," "conveys
that the 'serious and advanced' illness is in a final stage, and that
the disease will kill the incarcerated person expeditiously if
intervention fails or is withdrawn."  Yet, under the former
standard, the required prognosis was not that the person had less
than 12 months to live *if treatment was withdrawn*.  Neither the
legislative history nor the text of the statute suggests that in
eliminating the specific time-estimated end-of-life requirement,

16

the Legislature intended to not only make individuals eligible if they are in the final stages of an illness but might be expected to live more than 12 months, but also to include those who are *not* actively progressing toward death due to their illness if they continue to receive available medical treatment.

### C. Metastatic solid-tumor cancer

We further disagree that the trial court was required to find Multani met the section 1172.2, subdivision (b)(1) criteria because the Legislature has already determined that any form of "metastatic solid-tumor cancer" is "a serious and advanced illness with an end-of-life trajectory." Essentially, Multani contends that once it was established that he has a metastatic solid-tumor cancer, the trial court had no legal basis to further evaluate whether his particular illness currently has an end-of-life trajectory.

If we considered the first part of subdivision (b)(1)—ending with the term "metastatic solid-tumor cancer"—in isolation, we might agree with Multani's argument. Subdivision (b)(1) identifies "metastatic solid-tumor cancer" as an example of an eligible condition, without any express qualification. Yet, "[w]e must also construe the words of the statute in context and give meaning to every word and phrase." (*People v. Molina* (2004) 120 Cal.App.4th 507, 514 (*Molina*).) In the unusual, but possible, circumstance that an incarcerated person has metastatic solid-tumor cancer that is effectively treatable, Multani's interpretation of the statute would render it necessary to ignore the subdivision's requirement that the condition be one with an "end-of-life trajectory." In contrast, reading "metastatic solid-tumor cancer" as including only those forms of the disease that

17

have an end-of-life trajectory allows meaning and effect to be given to both terms.

Two additional canons of statutory interpretation are relevant. " '*Noscitur a sociis* ("it is known by its associates") is the principle that " ' "the meaning of a word may be enlarged or restrained by reference to the object of the whole clause in which it is used." ' " [Citations.]' [Citation.] In other words, 'a word takes meaning from the company it keeps.' [Citation.] ' "In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list." [Citation.]' [Citation.]" (*Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13, 40.) The canon of *ejusdem generis* "explains that, when a particular class of things modifies general words, those general words are construed as applying only to things of the same nature or class as those enumerated." (*People v. Arias* (2008) 45 Cal.4th 169, 180.) "[W]hen a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1011–1012.)

Here, the statute provides a non-exclusive list of examples of serious and advanced illnesses with an end-of-life trajectory. In addition to metastatic solid-tumor cancer, the examples are ALS, end-stage organ disease, and advanced end-stage dementia. Without qualification, the terms organ disease and dementia might encompass conditions with a wide range of prognoses and

levels of impairment.  However, the addition of "end-stage" and "advanced end-stage," limits eligibility to those forms of the diseases that remain in the broader category of "serious and advanced illness with an end-of-life trajectory."  We note that in adopting language from the federal guidelines, the Legislature *added* "end-stage" to the example of "advanced dementia," further highlighting that the condition presently must have an end-of-life trajectory.

The Oxford English Dictionary defines ALS as "[a] rare degenerative motor neurone disease which results in progressive muscular atrophy, [usually] beginning in the hands, and spasticity in the limbs."  (Oxford English Dict. Online (3d ed. 2024) <https://www.oed.com/dictionary/amyotrophic-lateral-sclerosis_n?tab=meaning_and_use> [as of Nov. 26, 2024], archived at <https://perma.cc/ZU5D-VRPK>.)  Similarly, Stedman's Medical Dictionary defines ALS as "a fatal degenerative disease involving the corticobulbar, corticospinal, and spinal motor neurons, manifested by progressive weakness and wasting of muscles innervated by the affected neurons; fasciculations and cramps commonly occur.  The disorder is 90–95% sporadic in nature (although a number of cases are inherited . . .), affects adults (typically, older adults), and usually is fatal within 2–5 years of onset."  (Stedman's Medical Dict. (online ed. 2014).)  By definition alone, ALS is typically an illness with an end-of-life trajectory: it is progressive, degenerative, and usually fatal.

An interpretation of "metastatic solid-tumor cancer" that treats all of the listed conditions in section 1172.2, subdivision (b)(1), similarly would thus incorporate the restriction that the cancer be progressing inexorably toward

death, or, in other words, currently on an end-of-life trajectory. (See *290 Division (EAT), LLC v. City and County of San Francisco* (2022) 86 Cal.App.5th 439, 457–458 [despite plain meaning of phrase, construing it consistent with other examples in the statute implied a specifically limited meaning]; see also *Prunty*, *supra*, 62 Cal.4th at p. 73 [concluding that use of "group" in statute in conjunction with "organization" and "association" suggested a meaning no broader than those terms; supporting this conclusion by reference to *noscitur a sociis* canon]; *Wendz v. California Dept. of Education* (2023) 93 Cal.App.5th 607, 651–652 [applying *noscitur a sociis* principle to narrowly construe "empirical" as referring to a specific type of research study].)

We must also "construe the statute in light of the legislative purpose." (*Molina*, *supra*, 120 Cal.App.4th at p. 514.) We can discern no legislative purpose for limiting compassionate release to individuals suffering from an illness with an "end-of-life trajectory," only to define that term to encompass conditions that have been successfully treated and whose progression has been halted indefinitely. Further, as explained above, even if reducing health care spending in prisons was one purpose of Assembly Bill No. 960, there is no indication that the Legislature intended cost-savings to be an *independent* factor in the determination of which incarcerated persons would be eligible for compassionate release. Had that been the Legislature's intent, it could have said so expressly, or provided examples of other conditions that are expensive to treat but, with treatment, do not have an end-of-life trajectory. Construing the reference to metastatic solid-tumor cancers as including only those that currently have an end-of-life trajectory is consistent with the clear legislative purpose of allowing individuals who are

20

medically incapacitated or dying to spend their remaining time outside of the carceral system.

### D. Substantial evidence supported the trial court ruling

With the understanding that "end-of-life trajectory" requires, at a minimum, an illness that is progressing toward death at the time the petition is filed, and that the trial court properly considered whether Multani's metastatic solid-tumor cancer currently has an end-of-life trajectory, we conclude substantial evidence supported the trial court's finding that the facts CDCR and Multani presented were insufficient to satisfy section 1172.2, subdivision (b)(1).

Although Multani's cancer is incurable, there is no indication in the record that his illness has progressed since he started his current course of treatment in 2017. Dr. Wilkinson described it as "perfectly suppressed." Medical records reported no evidence of "disease progression" or "active disease." We do not discount that Multani's condition could deteriorate if his current treatment ceases to work and other treatment options now available prove ineffective, or if he begins to suffer adverse side effects from his current or future methods of treatment. However, at the time of the hearing, these were mere possibilities. When asked how Multani might be expected to respond to his treatment in the future, Dr. Wilkinson testified that "the best expectation is people tend to continue doing how they've done in the past." The expectation set by the past seven years is that Multani will continue to respond well to treatment and his cancer, though incurable, will remain suppressed. That an illness that is neither progressing nor detectable in active form on medical scans will likely shorten an incarcerated person's

21

overall life expectancy does not indicate the illness *currently* has an end-of-life trajectory, as the statute requires.

Multani contends that the few published decisions interpreting section 1172.2 support the conclusion that his illness has an "end-of-life trajectory." However, as he concedes, it was undisputed that the incarcerated persons in those decisions were medically incapacitated or terminally ill under section 1172.2, subdivision (b)(1) or (2). In each, the incarcerated person had a life expectancy of one year or less, including with treatment. (See *Gonzalez*, *supra*, 103 Cal.App.5th at p. 367 ["defendant was diagnosed with metastatic rectal cancer 'with a clear end of life trajectory and one year expected survival' "]; *Lewis*, *supra*, 101 Cal.App.5th at pp. 404, 405 [incarcerated person "was diagnosed with amyotrophic lateral sclerosis (ALS), which was rapidly progressing" and "had a life expectancy of less than six months"]; *Nijmeddin v. Superior Court* (2023) 90 Cal.App.5th 77, 80 [incarcerated person had "advanced incurable pancreatic cancer, biliary adenocarcinoma, and other comorbid medical conditions" with "a life expectancy of less than one year, even with chemotherapy treatment, which he has decided to forgo"].) Multani contends his circumstances are comparable because "Dr. Wilkinson estimated Mr. Multani will have less than six months to live once the effectiveness of his [current treatment] begins to fail or it is discontinued due to increasingly problematic side effects." However, as discussed, neither circumstance had come to pass at the time of the hearing. Multani is plainly differently situated from the defendants in the cases on which he relies.

22

Nothing in the trial court's ruling, or in this opinion, forecloses the possibility that Multani may obtain compassionate release in the future if his circumstances change.

## DISPOSITION

The order denying the petition is affirmed.




                                        ADAMS, J.



We concur:




                 EGERTON, Acting P. J.




                 HANASONO, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.